J-S17010-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ALICE WILSON | : | |
| | : | |
| Appellant | : | No. 895 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 20, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005346-2023

BEFORE: PANELLA, P.J.E., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED AUGUST 6, 2026**

Alice Wilson appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas for her convictions of voluntary manslaughter–unreasonable belief, 18 Pa.C.S.A. § 2503(b) ("imperfect self-defense") and possessing an instrument of crime ("PIC"), 18 Pa.C.S.A. § 907(a). Wilson challenges the sufficiency of the evidence, the weight of the evidence, and the discretionary aspects of sentencing. After careful review, we affirm.

On May 27, 2023, Wilson was arrested for the murder of her wife, Eileen Adams. The charges of murder generally and PIC were held for court following a preliminary hearing on July 31, 2023. The matter proceeded to a bench trial on September 3, 2024, where the Commonwealth agreed to pursue no higher

_____

[*] Retired Senior Judge assigned to the Superior Court.

than third degree murder, rather than murder generally, and the defense requested that the lesser included offense of voluntary manslaughter be considered as a possible verdict. **See** N.T., 9/3/24, at 5-6.

The trial court aptly summarized the evidence presented at trial.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, Police responded to a call to 3300 Kayford Circle in Philadelphia in the late afternoon on May 27, 2023, finding Eileen Adams inside of her residence suffering from two gunshot wounds.

At trial, the parties stipulated that Dr. Khalil Wardak, an assistant Medical Examiner with the City of Philadelphia, is an expert in the field of forensic pathology. Dr. Wardak testified that he examined the remains of [Adams] in this case who died of two gunshot wounds to her torso, one to her chest, through the right lung, the first rib in the back and exited from the midback shoulder, the other to her abdomen, through her stomach, liver, right lung and exits through her ninth rib in the back. (N.T. 09-03-2024, pp. 20-24). Both bullets travelled front to back, left to right and upward. Both gunshots were of indeterminate range, which Dr. Wardak explained: if there is evidence "that we identify on the skin and on the entrance wound consistent with gunpowder and if the evidence is absent, we cannot determine the range of firing. If we see soot and stippling that is generated by the gunpowder, very close, if we just see the stippling, it is intermediate range and if we don't see stippling or soot, that's indeterminate range." ([**Id.** at] 24-25). The Medical Examiner stated that, generally speaking, if there is no stippling powder the gunshot would have taken place at least three feet away. [On cross-examination, defense counsel asked Dr. Wardak whether, if someone is wearing clothes when they are shot, "would you agree with me that the soot and stippling would be on the clothing and not on the actual wound?" **Id.** at 38. Dr. Wardak responded, "Yes. It depends on the thickness of clothing, yes." **Id.** Further, Dr. Wardak stated that the blood stains on the clothing could have covered soot or stippling on the clothes. **Id.** at 39. On redirect examination, Dr. Wardak stated that he did not see any soot or stippling on Adams' clothing and that Adams was wearing shorts, panties, a bra, t-shirt, and socks. **See id.** at 41.] Dr. Wardak further testified as to the trajectory of the bullets from their entrance and exits and that

since the bullet was going upward, there were only three scenarios: the person being shot was on the ground; [Adams] was walking up the stairs with the shooter at the bottom; or the shooter is on the ground and [Adams] is standing. ([*Id.* at] 25-32). Additionally, the doctor determined, to a reasonable degree of medical certainty, that the gunshot wounds were the cause of death and the manner of death was homicide. ([*Id.* at] 33-36).

Officer David Killingsworth testified that he responded to a radio call of a person with a gun to Kayford Circle, that he entered the house and saw medics working on a female lying on the living room floor. The officer's body cam video had been activated and was produced during the trial. ([*Id.* at] 44-46).

Homicide Detective Craig Coulter was next to testify and he described the photos of the crime scene upon his arrival, including the body of [Adams], from under which the firearm was recovered. This detective executed a search warrant on the premises[,] recovering the gun, bullet fragment, fired cartridge casings, live ammunition, cell phones[,] insurance papers and other items of evidentiary value. ([*Id.* at] 56-66).

Thorsten Lucke, another homicide detective next testified as a stipulated expert in the field of forensic extraction of data from cellular devices. ([*Id.* at] 71-72). Five cell phones were recovered from the scene, and he was able to perform full forensic extractions from four of the five. ([*Id.* at] 73-74). On one of the devices, attributable to [Wilson], texts were sent to another party under the contact name of 'PatsCafePat' on May 26, 2023 at 11:15 p.m., that [Wilson] is getting a divorce. The other party responds the next day, concluding with "I love you". ([*Id.* at] 77-81). On the same phone, beginning on May 16, 2023, there are several searches inquiring if married, and the house [is] only in wife's name, will she get one-half of the value of the house in a divorce. Further searches attempt to refine the inquiry that she paid one-half, although her name not on the deed, will she get half. ([*Id.* at] 80-84). . . .

Homicide Detective Richard Bova was next on the stand, advising he was the assigned detective in this case, who produced photos of [Wilson], taken at homicide on the date of the incident, showing no injuries to Wilson. ([*Id.* at] 88-91). The assigned [detective] also recovered a video from one of the phones attributed to [Wilson] on May 12[], 2023, two weeks before the homicide,

where Wilson was berating [Adams] over money. ([***Id.*** at] 95-97). The officer further testified that ATF had found records indicating [Adams] had purchased the gun, and that although there was a Ring doorbell camera, no video data from the day of the homicide—either because the battery was dead, the device didn't capture anything or everything for that day was deleted. ([***Id.*** at] 98-99, 104-107).

Jonathan Adams, Jr., [Adams'] son, took the stand and testified that on the day of the homicide, he was stationed in Lemoore, California and he had spoken with his mother, via a phone call earlier that afternoon. Upon finding out about his mother's demise, he travelled to Philadelphia and came to his mother's house. He was cleaning up the house and he picked up the blood soaked living room rug to get rid of it when he saw, and photographed a bullet fragment in the floor, underneath the blood spot. ([***Id.*** at] 108-115).

Trial Court Opinion, 8/27/25, at 3-5 (prefixes omitted).

In closing, Wilson primarily argued that the Commonwealth failed to disprove self-defense because the forensic evidence established that one of the shots was fired when Adams was standing over Wilson and because the Commonwealth did not test Adams clothing for stippling or soot and therefore could not rule out that Wilson shot Adams at close range during a struggle. ***See*** N.T., 9/3/24, at 125-26. The Commonwealth argued that the evidence contradicted Wilson's claim of self-defense during a struggle over the firearm because one of the two shots occurred when Adams was laying on the ground and that the shots occurred at a distance of at least three feet because Adams was wearing "thin" clothing and there was no stippling or soot on her body. ***See id.*** at 131-34.

- 4 -

The trial court found Wilson guilty of voluntary manslaughter and PIC.[1] On March 20, 2025, Wilson was sentenced to 10 to 20 years' incarceration for voluntary manslaughter, and five years of probation for PIC, imposed consecutively. On March 24, 2025, Wilson filed a post-sentence motion challenging the weight of the evidence for voluntary manslaughter and the discretionary aspects of sentencing.[2] A few days later, the trial court denied the motion without a hearing. Wilson timely appealed. Both Wilson and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. **See** Pa.R.A.P. 1925(a)-(b).

Wilson raises the following issues for our review.

1. Whether the evidence was insufficient to prove [Wilson was] guilty of voluntary manslaughter murder?

2. Whether the verdict for voluntary manslaughter and [PIC] was against the weight of the evidence?

_____

[1] After filing her appeal, Wilson filed a "motion to correct docket entry and modify record." Wilson asserted that "[t]he certified docket and sentencing order in this matter erroneously reflect a conviction under § 2503(a)(2) (a provoked, accidental killing of a third party)[,]" which is incorrect "as the verdict and trial evidence establish that the conviction falls under § 2503(b) ('imperfect self-defense')." Motion, 8/14/25, at ¶¶ 6-7. The Commonwealth agreed, and on September 2, 2025, the trial court granted Wilson's motion and directed the Clerk of Courts to correct the record "to reflect a conviction under 18 Pa.C.S. § 2503(b)—Voluntary Manslaughter based on 'unreasonable belief killing justifiable' ('imperfect self-defense')." Order, 9/2/25, at ¶ 2.

[2] Wlson also asserted that trial counsel was ineffective for never meeting with her in person before trial and failing to call any character witnesses on her behalf. **See** Motion, 3/24/25, at ¶ 5. She does not raise this ineffectiveness issue on direct appeal.

3. Whether the sentence imposed was manifestly excessive and an abuse of discretion as the court relied on an impermissible factor and failed to weigh mitigating factors?

Appellant's Brief, at vii (reordered).

In her first issue, Wilson challenges the sufficiency of the evidence for her voluntary manslaughter conviction.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all of the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Spence*, 290 A.3d 301, 309 (Pa. Super. 2023) (citation omitted). Additionally, only "where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, [is] the evidence [] insufficient as a matter of law." *Commonwealth v. Heater*, 899 A.2d 1126, 1131 (Pa. Super. 2006) (brackets and citation omitted).

Although Wilson contended that she acted in self-defense, she was found guilty of "imperfect self-defense," *i.e.*, voluntary manslaughter under Section 2503(b) of the Crimes Code.

> **(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b).

When a defendant is convicted under Section 2503(b), all principles required to establish justification (18 Pa.C.S.A. § 505) are met, except the defendant has an unreasonable rather than a reasonable belief that deadly force was necessary. **See Commonwealth v. Green**, 273 A.3d 1080, 1087-88 (Pa. Super. 2022); **see also Commonwealth v. Truong**, 36 A.3d 592, 599 (Pa. Super. 2012) (*en banc*) ("A successful claim of imperfect self-defense reduces murder to voluntary manslaughter.") (citation omitted). Generally, deadly force is not justified "unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat[.]" 18 Pa.C.S.A. § 505(b)(2). "[T]he defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis." **Green**, 273 A.3d at 1087 n.6 (citation omitted).

"If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." **Commonwealth v. Houser**, 18 A.3d 1128, 1135 (Pa. 2011) (citation omitted). "The Commonwealth cannot sustain its burden of proof solely on the factfinder's disbelief of the defendant's testimony. The disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact." **Commonwealth v. Rivera**, 983 A.2d 1211, 1221 (Pa. 2009) (brackets, internal quotation marks, and citation omitted).

Wilson asserts that the Commonwealth failed to establish that Wilson was under an unreasonable belief that deadly force was necessary. **See** Appellant's Brief, at 15-16. Wilson argues various pieces of evidence demonstrate "an armed encounter by [Adams] and [Wilson's] efforts to survive that attack." **Id.** at 16. Namely, Wilson contends that the evidence established: (1) Adams was armed with her own firearm and threatened Wilson with it; (2) there was a close-range struggle for the firearm while Adams was in a low disadvantaged position; (3) Wilson's conduct was reactive in face of a lethal threat where she had no time to deliberate; (4) her account of the events remained consistent and was corroborated by the firearm being recovered under Adams' body and an upward bullet trajectory consistent with Wilson being in a defensive position; and (5) her post incident conduct of calling 911, rendering aid, and fully cooperating was inconsistent with guilt.

*See id.* Additionally, Wilson argues that the trial court should not have considered her alleged motive—the pending divorce—because it is irrelevant to imperfect self-defense. *See id.* at 16-17.

The Commonwealth argues that it presented sufficient evidence for the court to reasonably infer that Wilson "could not have reasonably believed her life was in imminent danger when she fatally shot her unarmed wife." Appellee's Brief, at 10. The Commonwealth asserts that the forensic evidence contradicted Wilson's claim that the firearm discharged at close range during a struggle for its possession, and instead demonstrates that Wilson "shot the unarmed victim twice, with each shot inflicting independently fatal injuries, and that she did so from a distance of more than three feet, rather than accidentally and in the course of a struggle for possession of the gun." *Id.* at 7, 10.

Viewed in the light most favorable to the Commonwealth, our review of the trial transcript reveals the following. First, contrary to Wilson's claim, there is no evidence that Adams was initially armed and threatened Wilson.[3] Second, Adams was shot twice, and each one was independently fatal. *See* N.T., 9/3/24, at 34-36. Third, the evidence showed that Adams' body was in a different position for the two shots: the trajectory and bruising from Adams'

---

[3] In fact, in another part of her appellate brief, Wilson refers to the issue of "who initiated the aggression" as an "unresolved fact[.]" Appellant's Brief, at 14.

bra strap indicated that for one of the shots, Adams was not against a hard surface (*i.e.*, the floor), but the other shot, based on the trajectory, and Adams body and a bullet fragment being found on the floor, occurred when Adams was laying on the floor.[4] ***See id.*** at 29-32. Fourth, Wilson had no documented injuries when police officers interviewed and photographed her on the day of the killing. ***See id.*** at 51, 90-91. Fifth, Wilson cites to no evidence in support of her contention that the firearm being found under Adams' body is *only* consistent with her account that Adams was standing over the top of her when she shot Adams.

The final piece of relevant evidence is the lack of stippling or soot found on Adams' body, from which Dr. Wardak concluded that the shots were fired from an indeterminate range of at least three feet. ***See id.*** at 23-25. He explained,

> There is evidence that we identify on the skin and on the entrance wound consistent with gunpowder and if the evidence is absent, we cannot determine the range of firing. If we see soot and

_____

[4] Dr. Wardak explained how, in contrast to the bullet that snapped Adams' bra strap, the other bullet likely struck Adams when she was on the ground:

> [The Commonwealth:] All right, but the bullet being in the floor, you said the [three possible positions based on the trajectory] would be [Wilson] laying down, [Wilson] up on the stairs, and [Wilson] standing above somebody on the ground, **you can say it probably isn't the first two of those**?
>
> [Dr. Wardak:] That would describe the trajectory of the bullet to the chest.

N.T., 9/3/24, at 32 (emphasis added).

stippling that is generated by the gunpowder, very close, if we see the stippling, it is intermediate range and if we don't see stippling or soot, that's indeterminate range [*i.e.*, more than three feet.]

*Id.* at 24-25.

On cross-examination, defense counsel challenged Dr. Wardak's conclusions. Dr. Wardak stated that whether stippling or soot would appear on only clothing and not the actual wound "depends on the thickness of clothing[.]" *Id.* at 38. Further, Dr. Wardak stated that he did not see any stippling or soot on Adams' clothing with his "bare eyes", the blood stains on the clothing could have covered soot or stippling, and that he did not perform chemical testing on the clothing. *See id.* at 39-42. On redirect examination, Dr. Wardak stated that Adams was wearing shorts, panties, a bra, T-shirt, and socks. *See id.* at 41.

Although Dr. Wardak did not specifically rule out that stippling or soot was on Adams' clothing, viewed in the light most favorable to the Commonwealth, it could reasonably be inferred from his testimony that, based on the clothing that Adams was wearing, a close-range shot would still have left some stippling or soot on the wounds. The lack of this evidence further undermined Wilson's account that she shot Adams during a close-range struggle over the firearm.

As the trial court concluded, "[t]he physical evidence shows that [Wilson's] actions were not justified." Trial Court Opinion, 8/27/25, at 9. The Commonwealth's evidence contradicted Wilson's version of events. The

Commonwealth introduced evidence which demonstrated that Wilson shot her unarmed wife twice, with some distance between them. Under such circumstances, we find no error in the trial court's finding that Wilson unreasonably believed that deadly force was justified.

Wilson further argues that the Commonwealth failed to meet its burden because the evidence presented supports two equally reasonable and mutually inconsistent inferences—her claim of self-defense and the Commonwealth's version of events.[5] *See* Appellant's Brief, at 9-11. If the evidence viewed in the light most favorable to the Commonwealth is "only, at most, equally consistent with a defendant's innocence as it is with his guilt, the Commonwealth has not sustained its burden of proving the defendant's guilt beyond a reasonable doubt." *In Int. of J.B.*, 189 A.3d 390, 415 (Pa. 2018) (footnote omitted). Wilson argues that *Commonwealth v. Torres*, 766 A.2d 342 (Pa. 2001) and *Commonwealth v. Eberle*, 379 A.2d 90 (Pa. 1977) are illustrative of this principle and factually analogous to her case. *See* Appellant's Brief, at 10-11. This argument is also unpersuasive.

*Eberle* is inapplicable to the instant case. Wilson cites to *Eberle* in support of her argument that the Commonwealth failed to meet its burden to prove that she had a safe avenue of retreat. *See* Appellant's Brief, at 10-11.

---

[5] We note that Wilson raises this argument in the section of her brief addressing the weight of the evidence. However, such a claim goes to the sufficiency of the evidence. *See In Int. of J.B.*, 189 A.3d 390, 393 (Pa. 2018).

- 12 -

However, that element of self-defense is not relevant because in the instant case the only element of self-defense that is at issue is whether Wilson reasonably believed that the use of deadly force was necessary. *See Green*, 273 A.3d at 1087-88. Therefore, *Eberle* does not warrant further discussion.

In *Torres*, our Supreme Court found that the Commonwealth failed to present sufficient evidence to support a simple assault conviction because the Commonwealth failed to disprove the defendant's claim of self-defense. The complainant told an officer that the defendant hit him on the head with a wrench, although the wrench was never found. *See Torres*, 766 A.2d at 344. The defendant testified and claimed that the complainant punched him in the face after which he shoved and punched the complainant, which caused the complainant to fall and hit his head. *See id.* The parties stipulated that the complainant received medical treatment for a wound on the back of his head. *See id.* Based on this evidence, our Supreme Court explained that this was insufficient for the Commonwealth to meet its burden of disproving the defendant's claim of self-defense because the "evidence serve[d] only to establish what [the defendant] concedes: an altercation occurred between [the complainant] and himself." *Id.* at 345. Further, the defendant's explanation for the cause of violence was uncontradicted and the physical evidence did not disprove the defendant's claim. *See id.*

In contrast, here, as previously discussed, the evidence does contradict Wilson's claim that she shot Adams during a close-range struggle over the

gun. In other words, the evidence viewed in the light most favorable to the Commonwealth does not make both versions of events equally likely, but rather the Commonwealth's version more likely, and therefore legally sufficient if the trier of fact decided to accept it. Accordingly, the Commonwealth presented sufficient evidence to disprove Wilson's self-defense claim and to sustain her conviction of "imperfect self-defense" voluntary manslaughter.[6]

In her second issue, Wilson argues that the trial court abused its discretion in denying her claim that her voluntary manslaughter conviction was against the weight of the evidence.[7]

> A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the fact finder. Rather, a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of

---

[6] Although Wilson does not raise the issue of the sufficiency of the evidence for her PIC conviction in her 1925(b) statement or in the statement of questions section of her brief, she briefly asserts that the Commonwealth failed to establish that she possessed the firearm with the requisite criminal intent. **See** Appellant's Brief, at 17-18. Her argument largely relies on her position that the Commonwealth failed to disprove that she acted in self-defense, which we reject. Therefore, the evidence was sufficient to sustain her PIC conviction. **See Commonwealth v. Weston**, 749 A.2d 458, 462-63 (Pa. 2000) (sustaining PIC and voluntary manslaughter convictions where "the evidence showed that appellee armed himself with a gun before confronting the decedent.").

[7] On appeal, Wilson also claims that her PIC conviction was against the weight of the evidence. However, in her post-sentence motion she only challenged the weight of the evidence for her voluntary manslaughter conviction. **See** Motion, 3/24/25, at ¶ 3. Therefore, she has waived appellate review of this claim. **See Commonwealth v. Lewis**, 45 A.3d 405, 410 (Pa. Super. 2012).

justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Where, as here, the judge who presided at trial ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

One of the least assailable reasons for granting or denying a new trial is the lower court's determination that the verdict was or was not against the weight of the evidence and that new process was or was not dictated by the interests of justice. Thus, only where the facts and inferences disclose a palpable abuse of discretion will the denial of a motion for a new trial based on the weight of the evidence be upset on appeal.

*Commonwealth v. Torsunov*, 345 A.3d 339, 351 (Pa. Super. 2025) (emphasis and citation omitted).

Wilson argues that the trial court misunderstood the forensic evidence when it concluded that Wilson fired a second shot at the victim when Adams was lying on the floor and no longer a threat. *See* Appellant's Brief, at 11-12. The Commonwealth argues that Wilson's claims are belied by the record and points out that the fact that two shots were fired further weighs against Wilson's claim that the gun discharged accidentally. *See* Appellee's Brief, at 12-13. We agree with the Commonwealth.

As previously discussed, the forensic and testimonial evidence was legally sufficient to disprove that Wilson had a reasonable belief that deadly force was necessary. To the extent that Wilson challenges the trial court's weighing of the evidence, her complaint is that the trial court credited the Commonwealth's evidence rather than her version of events. We decline to

re-weigh the evidence in Wilson's favor as such assessments are outside our scope of review. *See Commonwealth v. Spence*, 290 A.3d 301, 311 (Pa. Super. 2023). Based on our review of the record, the evidence was not so tenuous, vague and uncertain as to shock the conscience of the court. Therefore, the trial court did not abuse its discretion in denying Wilson's weight of the evidence claim.

In her final issue, Wilson challenges the discretionary aspects of sentencing. "An appeal raising the discretionary aspects of sentencing is not guaranteed as of right; rather, it is considered a petition for permission to appeal." *Commonwealth v. Mulkin*, 228 A.3d 913, 916 (Pa. Super. 2020) (citation omitted). Before we consider the merits of a discretionary sentencing challenge, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

*Commonwealth v. McCarthy*, 180 A.3d 368, 380 (Pa. Super. 2018) (citation omitted).

Here, Wilson's appeal was timely, she preserved the issue in a post-sentence motion, and her brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence. Further, Wilson's claim that the trial court abused its discretion by considering her "lack of remorse" as an aggravating factor when she

consistently maintained she acted in self-defense, and by failing to meaningfully weigh undisputed mitigating factors, raises a substantial question. *See Commonwealth v. Salter*, 290 A.3d 741, 748 (Pa. Super. 2023). Therefore, we will consider the merits of Wilson's claim.

Our standard of review for a challenge to the discretionary aspects of sentencing is well-established.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Agugliaro*, 342 A.3d 105, 116 (Pa. Super. 2025) (citation omitted).

A sentencing court is required to consider the protection of the public, the gravity of the offense in relation to the impact on the victim and the community, and the rehabilitative needs of the defendant. *See* 42 Pa.C.S.A. § 9721(b). When a sentencing court sentences outside the sentencing guidelines, we will vacate and remand for resentencing if "the sentence is unreasonable." 42 Pa.C.S.A. § 9781(c)(3). In reviewing the record we consider "(1) The nature and circumstances of the offense and the history and characteristics of the defendant[;] (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation[;] (3) The findings upon which the sentence was based[; and] (4) The guidelines

promulgated by the commission." 42 Pa.C.S.A. § 9781(d). Additionally, "[i]f the court imposes a sentence outside of the sentencing guidelines, it must provide a written statement setting forth the reasons for the deviation and the failure to do so is grounds for resentencing." **Commonwealth v. Walls**, 926 A.2d 957, 963 (Pa. 2007).

Wilson argues that the trial court abused its discretion by sentencing her to an excessive sentence above the guideline range based "sole[ly]" on her denial of responsibility. **See** Appellant's Brief, at 18. She argues that this was an abuse of discretion because denial of responsibility is inherent in "imperfect self-defense", she expressed remorse, and the trial court did not consider mitigating factors such as her lack of criminal history, her immediate call to 911 and attempt to render aid, and her cooperation with law enforcement. **See id.** at 19-24. The Commonwealth argues that the trial court did not abuse its discretion in imposing an above-guideline sentence because the trial court explained its reasons for the upward departure, considered the presentence investigation ("PSI") report, and the sentence imposed was not unreasonable. **See** Appellee's Brief, at 14. We are constrained to find that Wilson's claim lacks merit.

Wilson had a prior record score of zero, and the offense gravity score for voluntary manslaughter was eleven. **See** 204 Pa. Code § 303.15. The trial court, Wilson, and the Commonwealth all agreed that where Wilson had a prior record score of zero and a deadly weapon enhancement was applicable, the

guideline range was 54 to 72 months, plus or minus 12 months; Wilson was sentenced above the guideline range. *See* Trial Court Opinion, 8/27/25, at 14; Appellant's Brief, at 18; Appellee's Brief, at 15; 204 Pa. Code § 303.16(a), 303.17(b).

The trial court explained its reasons for imposing a sentence above the guideline range.

> [Wilson's] lack of remorse was astounding. In a video call to her brother on August 29, 2024, **Wilson wished that [Adams] were still alive, but only so that [Adams] could be more tortured because death is a relief**. (N.T. 03-20-2025, pp. 44-45). During sentencing, Ms. Wilson went on a tirade concerning how her attorney didn't know what she was doing, how the verdict needed to be vacated, that the only remorse she had was that she couldn't get the gun away from the victim, and that the money to pay for the house was her money—it came from [Wilson's] construction company and so on. ([*Id.* at 48-62]). Ms. Wilson insisted on giving her rendition of what happened, contrary to the clear physical evidence presented at trial. The lack of remorse, coupled with her wish that [Adams] was still alive so she could be tortured more, clearly showed [Wilson's] need for a substantial term of imprisonment with mental health treatment, which is exactly what this court ordered.
>
> Taking [Wilson's] conduct into consideration, along with considerations of public policy, a sentence outside of the aggravated range was warranted.
>
> . . . .
>
> While issuing the sentence the court stated: "I'm going outside of the guidelines. You denied any responsibility. You didn't do anything, is exactly what you just told me and it flies in the face of everything that was shown in front of this court. For voluntary manslaughter, the sentence of the court is 10 to 20 years' incarceration. For possessing instruments of crime, it's 5 years of reporting probation to run consecutive. ([*Id.* at] 63).
>
> . . . .

- 19 -

The court reviewed all of the materials submitted, including the [PSI] report, and considered all the testimony and arguments of counsel and imposed an appropriate sentence. The undersigned considered [Wilson's] mental health and rehabilitative needs as well as her history, the need for the protection of the public and the gravity of the offense.

Again, given [Wilson's] lack of remorse, coupled with her wish that [Adams] was still alive so she could be tortured more, along with her history that was detailed in the pre-sentence investigation, warranted a substantial term of imprisonment with mental health treatment.

Trial Court Opinion, 8/27/25, at 14-16 (emphasis in original; prefixes and unnecessary capitalization omitted).

We reject Wilson's contention that the trial court impermissibly sentenced her based on Wilson maintaining that she was justified in using deadly force. Instead, the trial court based its determination that Wilson lacked remorse on its observations of Wilson and Wilson's conduct. "[L]ack of remorse is an appropriate sentencing consideration[,]" and "[t]he trial court may base its findings regarding remorse on its own observations of the defendant." *Salter*, 290 A.3d at 749-50 (brackets, ellipsis, and citation omitted). We acknowledge Wilson stated at the sentencing hearing that she had remorse. *See* N.T., 3/20/25, at 50, 54. However, the trial court found that Wilson's behavior and other statements indicated that she was not remorseful. This was a finding that was within the trial court's discretion and we discern no abuse of that discretion. Additionally, the trial court explained that it considered the mitigating factors including the PSI report. "[W]here a

sentencing court is informed by a PSI, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Miller*, 275 A.3d 530, 535 (Pa. Super. 2022) (internal quotation marks and citation omitted). Therefore, we discern no abuse of discretion.

For the foregoing reasons, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/6/2026